IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| CYNTHIA ANN JONES, | * |
| Plaintiff, | * |
| vs. | * |
| | CASE NO. 4:20-CV-307 (CDL) |
| COLUMBUS REGIONAL HEALTHCARE SYSTEM, INC., | * |
| | * |
| Defendant. | * |

O R D E R

Cynthia Ann Jones filed this action against her former employer, Columbus Regional Healthcare System, Inc., asserting a claim of sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. Jones contends that Columbus Regional fired her for engaging in the same misconduct as a male employee, Charles Moffett, who was suspended but not fired. Columbus Regional filed a summary judgment motion, asserting that Moffett was not similarly situated to Jones and that Jones thus cannot prove intentional sex discrimination. As discussed below, the Court agrees and grants Columbus Regional's summary judgment motion (ECF No. 14).

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

## FACTUAL BACKGROUND

Jones, who worked as a security assistant at the Piedmont Columbus Regional Midtown hospital for nearly ten years, was familiar with the hospital's patient valuables policy.  That policy required Jones to secure a patient's valuables in the hospital security department's safe when necessary and to properly document that she had done so.

In January 2020, Raheem Hunter, who was unconscious at the time, was admitted as a patient to the hospital's intensive care unit.  Raheem's brother, Salaam Hunter, accompanied him and was listed as Raheem's only emergency contact on the hospital's "face sheet."  When Raheem arrived at the hospital, his personal possessions included a watch, a credit card, a debit card, and a cell phone.  Under the hospital's policy, if a patient does not assume responsibility for his own personal property or send the

property home, then the property is stored in the security department's safe, and a "Declaration of Patient's Valuables Form" must be completed. Jones Dep. Ex. 2, Patient Valuables Policy 1, ECF No. 19-2. Because Raheem was unconscious when he was admitted to the hospital, a hospital security assistant documented the receipt of his property and took the property to the security department's safe.

Jones knew Raheem; they shared a sixteen-year-old daughter named Miyah. Jones and Raheem were not married, and neither Jones nor Miyah was listed on the "face sheet" as an emergency contact for Raheem. Jones represents that while Raheem was unconscious in the ICU, Miyah received permission from Raheem's brother Salaam and an ICU nurse to have Raheem's personal property released to Miyah. Jones and Miyah went to the security department to speak with Jones's shift supervisor, Andrew Knight. Jones represents that she told Knight that Salaam had approved the release of Raheem's phone to Miyah, and she contends that Knight approved the release of Raheem's property to Miyah.[1] Jones then went to Moffett, the security assistant on duty who was responsible for patient valuables that day, and told him that she had received approval for Raheem's property to be released to Miyah. Relying on that

---

[1] Knight denies approving the release of the property to Miyah, but Jones asserts that she received approval from Knight.

3

representation, Moffett released Raheem's personal property to Miyah. Jones signed the release form as a witness.

The Patient Valuables Policy lists three ways for the security department to release a patient's property: (1) if the "patient requests the return of their valuables," they are returned to the patient; (2) if the patient dies, his valuables may be released to a funeral home "when the funeral home picks up the patient's remains;" and (3) if the patient dies, his valuables may be "released to the listed next of kin who has been deemed responsible for making medical decisions or decisions regarding disposition of the body." Patient Valuables Policy 2-3. There is no dispute that an employee who violates that patient valuables policy is subject to discipline. The policy does not, on its face, permit the release of a patient's personal property to his minor daughter based on a representation that the patient's emergency contact verbally approved the release. Jones, though, argues that the policy is flexible because it states that the guidelines should not be used "as a substitute for the exercise of good judgment as it is recognized that a guideline may not be uniformly appropriate." Patient Valuables Policy 3.

Raheem died two days after his property was released to Miyah. Several days later, the hospital's security director received a report that a man who identified himself as Salaam

4

Hunter complained that Raheem's minor daughter had received Raheem's property without authorization. Owens Decl. ¶ 4, ECF No. 14-4; Woodham Decl. ¶ 5, ECF No. 14-3.[2] Jones does not dispute that someone identifying himself as Salaam Hunter contacted the hospital; she believes that he initially agreed to the release of property to Miyah but later changed his mind.

The security director asked the human resources department to investigate, and Human Resources Director Jan Woodham assigned the investigation to Chad Owens, a senior human resources generalist. Owens Decl. ¶ 5; Woodham Decl. ¶ 6. During the same timeframe, a man who identified himself as Steve French contacted Woodham, represented that he was Raheem's father, and told Woodham that Raheem's minor daughter had received Raheem's property without authorization. Woodham Decl. ¶ 8. French also told Woodham that Salaam Hunter had asked Jones to return Raheem's property but that Jones refused to return it. *Id.* Jones does not dispute that someone identifying

---

[2] Jones objects to the declarations of Owens and Woodham. First, she contends that the declarations are not based on personal knowledge. But they are. The declarations detail conversations that Owens and Woodham participated in and actions they took based on those conversations, and the Court is satisfied that Owens and Woodham have personal knowledge of the matters in their declarations. Second, Jones contends that the declarations should be disregarded because they contain hearsay. While the declarations do contain statements by out-of-court declarants, those statements are not being offered to prove the truth of the matter asserted; instead, they are being offered to explain each declarant's subsequent conduct. For these reasons, Jones's motion to strike the declarations (ECF No. 21) is denied.

5

himself as Steve French contacted the hospital, but she does argue that French is not related to Raheem.

Woodham was also contacted by a man who identified himself as Saleem Hunter and represented that he was Raheem's brother. This man told Woodham that after Raheem died, he realized that he had not retrieved Raheem's property, so he went to the security department. Woodham Decl. ¶ 9. According to the man, a security officer told him that the property had been signed out to Raheem's daughter, with Jones as a witness. The man told Woodham that the daughter was not authorized to receive the property and that he had never authorized the daughter or anyone else to obtain the property. *Id.*

Owens interviewed Jones and Moffett, and he reviewed documentation relevant to the incident. According to Owens, Jones reported that Salaam gave Miyah permission to get Raheem's phone. Owens Decl. ¶ 10.i. Jones also reported that she went to Shift Supervisor Knight's office to tell him about this permission and that she assumed Knight heard what she was telling him. *Id.* ¶¶ 10.m-10.n. According to Owens, Jones did not say that Knight acknowledged hearing what she told him. *Id.* ¶ 10.o. Jones stated that she left Knight's office and went to the safe room to meet Moffett. *Id.* ¶ 10.p. Moffett reported to Owens that Jones told him she had received permission to sign out Raheem's personal property to Miyah. *Id.* ¶ 10.q. Moffett

6

claimed that because Jones had come directly from Knight's office, he assumed Jones had gotten approval for the release from Knight. *Id.* ¶ 10.r. Moffett told Owens that he later realized he should have verified everything before signing out Raheem's property to Miyah. *Id.* ¶ 10.t. Jones later claimed to Owens that Miyah was entitled to Raheem's personal property because she was his next of kin. *Id.* ¶ 10.v.

After Owens completed his investigation, he submitted a report to Woodham. *Id.* ¶ 8. Owens and Woodham met with Director of Security Chris Cannon and Employee Relations Manager Steve Grant to discuss the situation. *Id.* ¶ 9; Woodham Decl. ¶ 11. They unanimously agreed that Jones should be terminated for intentionally violating the hospital's security department policy for personal gain. Owens Decl. ¶ 12; Woodham Decl. ¶ 14. They also unanimously agreed that Moffett should be suspended from work for one day; they concluded that he had been negligent in the performance of his duties, that he mistakenly assumed that Knight had approved the release, and that Jones intentionally misled Moffett to believe that he could release Raheem's property. Owens Decl. ¶ 13; Woodham Decl. ¶ 15.

Knight and Owens met with Moffett to explain that he would be suspended based on his conduct. Owens Decl. ¶ 14. Moffett disagreed with the decision and said he felt that Jones manipulated him to release the property. *Id.* Knight and Owens

7

later met with Jones to explain that she would be terminated for misconduct. *Id.* ¶ 16. According to Woodham, Knight was not involved in the decision to terminate Jones, but Woodham had him deliver the termination news because Cannon had left the hospital for another position before the termination decision could be communicated to Jones. Woodham Decl. ¶¶ 17, 20.

## DISCUSSION

Title VII makes it unlawful for an employer to discharge an employee because of her sex. 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment, a plaintiff alleging intentional discrimination under Title VII "must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). One way to do that in a circumstantial evidence case like this one is "by satisfying the burden-shifting framework set out in" *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lewis*, 918 F.3d at 1220. "When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Id.* at 1220-21. "If the plaintiff succeeds in making out a prima facie

8

case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221. "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." *Id.*

Here, there is no dispute regarding the first three elements of Jones's prima facie case. The dispute is whether Columbus Regional treated a "similarly situated" employee outside Jones's protected class more favorably. Jones asserts that she engaged in the same conduct as Moffett, a man, but she was fired and Moffett received a one-day suspension. So, the question for the Court is whether Jones and Moffett were similarly situated. When a plaintiff seeks to prove discrimination with evidence that a similarly situated employee outside her protected class was treated more favorably than herself, she must show that the comparator was "similarly situated in all material respects." *Id.* at 1226. That means that a valid comparator (1) engaged in the same basic conduct as the plaintiff, (2) was subject to the same employment policies and decisionmaker, and (3) shared the plaintiff's employment or disciplinary history. *Id.* at 1227-28. An employer, of course, "is well within its rights to accord different treatment to employees who are differently situated in 'material respects'— e.g., who engaged in different conduct, who were subject to

9

different policies, or who have different work histories." *Id.* at 1228.

Here, even in the light most favorable to Jones, the evidence does not support a reasonable inference that her termination was motivated by her sex because the evidence does not establish that she was similarly situated to Moffett in all material respects. Jones does not dispute that two men contacted the hospital to complain that Jones had helped Miyah obtain Raheem's personal property without authorization. She contends that the hospital's investigation was flawed because it did not adequately verify the identity of the two men who contacted the hospital and did not require them to make formal statements. But Jones does not dispute that the hospital was faced with complaints that Jones had participated in having Raheem's property released to Miyah without permission—including two separate complaints from someone purporting to be the very person whose alleged permission Jones relied on in seeking the property for Miyah.

From all of this, Owens, Woodham, Grant, and Cannon concluded that Jones had not received permission from Salaam to have Raheem's property released to Miyah. The Court understands that Jones believes—based on a conversation that took place outside of her presence—that Miyah got permission from Salaam and an ICU nurse to retrieve Raheem's phone. She conveyed that

10

information to Owens, but Owens and the others believed based on the totality of information they had—including two complaints by someone who identified himself as Salaam—that Salaam had not actually granted the permission, which is why they concluded that both Jones and Moffett violated the patient valuables policy, albeit to differing degrees. Again, the hospital's policy does not permit the release of a patient's personal property to his minor daughter without some type of permission.

Owens and the others determined that Jones sought release of Raheem's property to Miyah even though she did not have permission do so, and they concluded that this misconduct was intentional. They also determined that Moffett relied on Jones's representation to release the property without verifying that his actions were permissible, and they found that his misconduct was negligent. Thus, Jones and Moffett did not engage in the same misconduct and are not similarly situated in all material respects, so Moffett is not a valid comparator. Without a valid comparator, Jones failed to establish a prima facie case of sex discrimination, so she cannot prevail under the *McDonnell Douglas* framework. Jones did not attempt to establish a fact dispute by any method other than the *McDonnell*

*Douglas* framework, so Columbus Regional is entitled to summary judgment on her Title VII claim.[3]

CONCLUSION

As discussed above, Columbus Regional's summary judgment motion (ECF No. 14) is granted, and Jones's motion to strike the two declarations (ECF No. 21) is denied.

IT IS SO ORDERED, this 16th day of May, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[3] Even if the Court concluded that the present record viewed in the light most favorable to Jones was sufficient to establish a prima facie case of intentional sex discrimination, Columbus Regional offered a legitimate nondiscriminatory reason for its decision: the hospital terminated Jones because the team that investigated the incident believed that Jones intentionally violated the patient valuables policy, while Moffett had only negligently violated it. Jones did not present any evidence to establish that this legitimate nondiscriminatory reason is pretext for discrimination. *See Lee v. Safe-Dry Carpet & Upholstery*, No. 20-14275, 2021 WL 3829028, at *3 (11th Cir. Aug. 27, 2021) (per curiam) ("An employer's honest, good-faith belief that an employee violated its policies is a legitimate reason for termination even if the employer's belief may have been mistaken or wrong.").